IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
(Louisville Division)

| | | |
|---|---|---|
| Edward Harpring and Mary Kenney, | : : : | |
| Plaintiffs, | : : | Case No. 3:21-cv-00691-RGJ |
| v. | : : : : | |
| Louisville/Jefferson County Metro Government, | : : : | |
| Defendant. | : | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF A PRELIMINARY INJUNCTION**

Plaintiffs Harpring and Kenney respectfully submit the following reply memorandum in support of their Motion for a Preliminary Injunction (Doc. 5).

The City's opposition brief (Doc. 13) not only fails to demonstrate how the Ordinance satisfies the demands of narrow tailoring and due process, it compounds the unconstitutionality of the law by invoking impermissible content- and viewpoint-based justifications for its adoption and implementation. In so doing, the City has further buttressed Plaintiffs' position that they are likely to succeed on the merits of their First Amendment claim against the Ordinance. Plaintiffs are entitled to the preliminary relief they seek.

**ARGUMENT**

**A. The City's Brief Advances Impermissible Content- and Viewpoint-Based Justifications for the Ordinance.**

Plaintiffs argued in their motion for a preliminary injunction that the Ordinance fails to satisfy the intermediate scrutiny that attaches to a content-neutral law restricting speech. In responding to that argument, however, the City goes where Plaintiffs did not anticipate: it ventures into

(impermissible) content- and viewpoint-based justifications for the Ordinance. This is no exaggeration. In asserting that Plaintiffs suffer no irreparable harm for the loss of exercising their free speech rights in a traditional public forum—a legally unfounded assertion[1]—the City claims that the Ordinance protects "unwilling listeners." Doc. 13, PageID.126 (citing *Hill v. Colorado*, 530 U.S. 703, 716 (2000)).[2] *McCullen v. Coakley*, however, could not be plainer: "[i]f . . . the speech outside Massachusetts abortion clinics caused offense or made listeners uncomfortable, such offense or discomfort would not give the Commonwealth a content-neutral justification to restrict the speech." 573 U.S. 464, 481 (2014). Indeed, *McCullen* states that a law is content-based if it is "concerned with [the] undesirable effects that arise from the 'direct impact of speech on its audience' or '[l]isteners' reactions to speech.'" *Id.* (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)). *See also Gerber v. Herskovitz*, 14 F.4th 500, 510 (6th Cir. 2021) (quoting *McCullen*). In other words, the City would have this Court use a content-based justification for its law, i.e., the protection of "unwilling listeners," in order to save it. *McCullen* squarely prohibits that, as do a legion of other decisions. *See Bible Believers v. Wayne Cty.*, 805 F.3d 228, 247 (6th Cir. 2015) (en banc) ("Listeners' reaction to speech is not a content-neutral basis for regulation") (quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992)); *Boos v. Barry*, 485 U.S. 312, 321 (1988) ("Regulations that focus on the direct impact of speech on its audience" are content-based); *Erznoznik v. Jacksonville*, 422 U.S. 205, 209 (1975) (the government has no power to "selectively . . . shield the public from some kinds of speech on the ground that they are more offensive than others."). The protection of speech in public rights of way that "one might otherwise tune out," is "a virtue, not a vice," *McCullen*, 573 U.S. at 476, and "the guiding First Amendment

---

[1] *See, e.g., Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citation omitted).
[2] *See also* Defendant's Exhibit C (Ohio Policy Evaluation Network Report), quoting the "[n]egative opinions on proximity of protesters to clinic": "those disgusting protesters shouldn't be allowed anywhere near the clinic." Doc. 13-3, PageID.135.

principle that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content applies with full force in a traditional public forum." *Id.* at 477 (citation omitted).[3]

It gets worse. The City contends that if this Court were to grant Plaintiffs a preliminary injunction, "Plaintiffs and protestors, *specifically right-wing protestors*, will feel more empowered than ever to continue the harassment, assaults, stalking and intimidation of patients." Doc. 13, PageID.127 (emphasis added). Not only does the City fail to provide a whiff of evidence that Plaintiffs engage in such conduct, the City moves—without hesitation or compunction—from a content-based justification for the Ordinance to a viewpoint-based one. It singles out "ring-wing protestors" as an object of the speech the Ordinance is intended to suppress. This is impermissible under the First Amendment. Viewpoint-based discrimination is an "egregious form of content discrimination," *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), and is "prohibited," no matter the forum at issue. *Pleasant Grove City v. Summum*, 555 U.S. 460, 461 (2009). If bad conduct is creating problems outside Louisville healthcare facilities, the viewpoint of the persons engaging in such conduct should be irrelevant. But the City has now, in no uncertain terms, admitted what the facially content-neutral Ordinance hides: its purpose is to target the content and viewpoint of certain speech and speakers. The City cannot possibly survive the strict scrutiny that attaches to such a regulation of speech. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (laws "adopted by the government 'because of disagreement with the message [the speech] conveys' . . . . must satisfy strict scrutiny") (citation omitted); *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997) (strict scrutiny is "the most demanding test known to constitutional law").

---

[3] As already discussed by Plaintiffs, *McCullen* places zero reliance on *Hill*, citing it only once to note that the prior Massachusetts law was modeled after the Colorado statute at issue in *Hill*. Also, given the fact that the Ordinance is clearly not based on the law at issue in *Hill*, but is modeled after the one struck down by *McCullen* (in certain sections, *verbatim*), *McCullen* is the controlling decision, not *Hill*.

**B.     The Ordinance Imposes an Obvious Burden on Plaintiffs' Protected Speech Activities.**

The City argues that Plaintiffs' First Amendment right to counsel patients in a face-to-face manner as they enter a healthcare facility "does not exist." Doc. 13, PageID.115–116. Not true. The type of counseling Plaintiffs engage in is no different than the sidewalk counselors in *McCullen*, whose "ability to initiate the *close, personal conversations* that they view as essential to sidewalk counseling," was compromised by the Massachusetts law. 573 U.S. at 487 (emphasis added). Contrary to the City's flat (and false) claim, "one-on-one communication" is "the most effective, fundamental, and perhaps economical avenue of political discourse." *Id.* at 488 (citation omitted).[4]

The City states further that "Plaintiffs can be seen, heard and distribute pamphlets from five feet away and even ten feet away." Doc. 13, PageID.115. The City's Exhibit G, Doc. 13-7, PageID.144, shows why this is not the case. That photograph captures exactly what Plaintiffs describe in their verified complaint, i.e., that because patients are being driven to the portion of the sidewalk within the buffer zone, and then surrounded by "escorts" as they enter EMW, Plaintiffs cannot effectively try to place a pamphlet in a patient's hands or try to engage in "personal, caring, consensual conversations." *Id.* at 464. *See also* Doc. 1, PageID.9 at ¶ 45 (noting how the zones forces Plaintiffs to raise their voices, undermining their desired quiet, conversational approach).  Moreover, because of the boisterous activity of some protestors outside EMW, *see* Doc. 13-2, PageID.133 (video), Plaintiffs' mode of quiet communication risks being drowned out entirely. "If all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled [the sidewalk counselors'] message." *Id.* at 489–90. In sum, and contrary to the City's claim, "[i]t is . . . no answer to say that petitioners can still be seen and heard by women within the buffer zones." *Id.* at 466. After

---

[4] Plaintiffs, of course, do not claim a right to trespass onto EMW's property. They only contend, per *McCullen* and decades of Supreme Court decisional law, that they have a right to engage in face-to-face conversations with persons on the public sidewalk, an area that has been "historically been open to the public for speech activities." *McCullen*, 573 U.S. at 476.

all, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State*, 308 U.S. 147, 163 (1939).

*McCullen* is clear: when the government makes it "more difficult" to hand out leaflets and engage in one-to-one communication, "it imposes an especially significant First Amendment burden." *Id.* at 489. The verified complaint shows that Plaintiffs' mode of communicating with EMW patients has been rendered not just difficult by the EMW zone, it's been all but eviscerated.[5]

**C.      The City Provides No Concrete Evidence that the Ordinance is Narrowly Tailored.**

To satisfy the demands of narrow tailoring, the City cannot simply assert its Ordinance, which eliminates protected speech in traditional public forums, works better than other alternatives and is easier to enforce. (Using that rationale, the City could ban all leafletting within the City because of a problem with litter.) Rather, the City must "present evidence showing that—before enacting the speech-restricting law—it 'seriously undertook to address the problem with less intrusive tools readily available to it.'" *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020) (quoting *McCullen*, 573 U.S. at 494). *See also Martin v. City of Albuquerque*, 396 F. Supp. 3d 1008, 1029 (D.N.M. 2019) (*McCullen* "creates a roadmap for conducting a narrow tailoring inquiry, making it clear that while the existence of a significant government interest may be adequately supported by prior caselaw and common sense, the government must present case-specific evidence that the restriction actually serves the stated goal without burdening too much speech in order to satisfy the narrow tailoring inquiry").[6]

---

[5] Assuming *arguendo* that the sidewalk counselors in *McCullen* "had no issues" with the prior bubble zone law, Doc. 13, PageID.123, that could have been the case for any number of reasons, including the fact that the prior law allowed a bubble zone to be pierced if the patient consented. Not only is this the thinnest of reeds on which to hang the claim that the Ordinance is narrowly tailored, it ignores Plaintiff's sworn testimony of how the Ordinance—not a defunct law of Massachusetts—detrimentally impacts their speech. *See* Doc. 1, PageID.8–9.

[6] While it is Plaintiffs' burden to show a likelihood of success on the merits, it is nonetheless the burden of the City to prove that the Ordinance comports with the First Amendment. *See, e.g., United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions") (citations omitted);

5

The City has failed to come forward with such evidence. It stands in the position of Massachusetts in *McCullen*, which lamely argued, "we have tried other approaches, but they do not work." *McCullen* 573 U.S. at 494. While the City provides some evidence to support its alleged *interests* (including evidence based on the viewpoint of certain speakers), it has not come forward with demonstrable evidence to support how the Ordinance *furthers* those interests in a narrowly tailored fashion. In other words, though the City may allege not have the resources to monitor activities outside the *one* facility to request a buffer zone (an assertion with no referenced evidence), Doc. 13, PageID.114, and though "victims/patients" allegedly do not file complaints (another assertion with no evidentiary reference), *id.*, that doesn't mean the suppression of First Amendment liberties is the constitutionally appropriate remedy. In fact, the LMPD Memorandum, submitted by the City as Exhibit E, reveals that the City is perfectly capable of investigating violations of state and local laws outside EMW, even though, as the memo concludes, "most of the activity of the protestors is *clearly lawful*." Doc. 13-5, PageID.141 (emphasis added).

Indeed, if most of the activity taking place outside EMW is lawful, and clearly so, that is all the more reason for the City to more narrowly tailor its efforts in pursuing those actors whose conduct is *unlawful*—not to silence protected speech activities of law-abiding citizens. And though the LMPD Memo requests "clarification," given the "very fine line" as to whether "some activity that could be interpreted as violations of city ordinances or perhaps KRS," *id.*, the City's answer was not to clarify (let alone, enforce) those existing laws, but to take the "path of least resistance" by "silencing speech." *McCullen*, 573 U.S. at 486.  Far from supporting the City's position, the LMPD Memo supports

---

*Thomas v. Bright*, 937 F.3d 721, 734 (6th Cir. 2019) ("To establish that a law regulating or restricting speech is narrowly tailored, 'the Government carries the burden of showing that the challenged regulation advances the Government's [compelling] interest in a direct and material way.'") (citation omitted; brackets in original). In other words, if the City cannot meet its burden—it cannot—then Plaintiffs are necessarily likely to succeed on the merits of their claims.

Plaintiffs' argument: the Ordinance "burden[s] substantially more speech than necessary to achieve the [government's] asserted interests." *Id.* at 486 (citation omitted).[7]

The City does not provide any concrete evidence why it could not more vigorously enforce laws already on the books, why it did not consider a local version of the federal Freedom of Access to Clinic Entrances Act (FACE Act), or why it could not pursue targeted injunctions against bad actors. *See McCullen*, 573 U.S. at 490–93 (setting forth potential ways the state could have handled abortion-related turbulence without resorting to silencing speech).[8] Moreover, if the City can work with EMW to document persons crossing a painted line, Doc. 13, PageID.115, why can it not work with EMW to document persons who engage in more egregious conduct, such as assault, harassment, etc.? Such evidence could be used not just for individual prosecutions, but to seek injunctions against specific lawbreakers. *See McCullen*, 573 U.S. at 495 ("if Commonwealth officials can compile an extensive record of obstruction and harassment to support their preferred legislation, we do not see why they cannot do the same to support injunctions and prosecutions against those who might deliberately flout the law"). Injunctive relief would not burden more speech, as the City strangely

---

[7] While the City's Exhibit B, Doc. 13-2, PageID.133, a highly edited video montage of activities outside EMW, might be evidence of the City's interests, it does nothing to demonstrate that the Ordinance is narrowly tailored to achieve those interests. In fact, the video itself states what has allegedly "emboldened protestors and led to a heightened state of danger": the City's "failure to enforce current laws." *Id.* at 2:32. The most logical way to fight harassment, disorderly conduct, blocking sidewalks, etc.—all referenced in the Police Report—is to prosecute those who engage in such conduct. *Cf. Schneider v. State*, 308 U.S. 147, 162 (1939) ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets.") Lawbreakers can and should be prosecuted without having to punish law-abiding citizens with the deprivation of their constitutional rights. Finally, it should be noted, most of the statements and activities documented in the video are antithetical to how Plaintiffs counsel patients. The verified complaint describes how Plaintiffs do so. Doc. 1, PageID.4 at ¶¶ 20–26.

[8] *See also Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (reversing lower court denial of a preliminary injunction, indicating that simply alleging that less restrictive alternatives are not effective is insufficient; evidence to that effect must be produced: "California argues that it has already tried an advertising campaign [as a less restrictive alternative]. But California has identified no evidence to that effect.").

7

claims, Doc. 13, PageID.120, but "focuses on the precise individuals and the precise conduct causing a particular problem." *McCullen*, 573 U.S. at 464.

It is remarkable that, seven years after *McCullen* was decided, the City not only declined to follow any of the Court's suggested potential remedies to further its alleged interests, it adopted a law modeled on the very statute *McCullen* unanimously struck down as unconstitutional.

**D.    Prophylactic Restrictions to Provide Ease of Enforcement are Antithetical to Narrow Tailoring.**

The City repeatedly asserts that the buffer zones are justified on the grounds that they provide officials with helpful bright lines. Doc. 13, PageID.115, 119. While the Court in *Hill* may have in dicta condoned the use of such bright lines, *see* Doc. 13, PageID.119, *McCullen* specifically eschews that rationale: "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." 573 U.S. at 495. Even though a buffer zone might "'make [a police officer's] job so much easier' . . . . that is not enough to satisfy the First Amendment." *Id. See also Free Speech Coal., Inc. v. AG United States*, 787 F.3d 142, 156 (3d Cir. 2015) ("ease of enforcement is not the touchstone for narrow tailoring") (citing *McCullen*); *Petrello v. City of Manchester*, No. 16-cv-008-LM, 2017 U.S. Dist. LEXIS 144793, at *34 (D.N.H. Sep. 7, 2017) ("the City may not use convenience or efficiency as a proxy for the narrow tailoring test") (citing *McCullen*); *McLaughlin v. City of Lowell*, 140 F. Supp. 3d 177, 191 (D. Mass. 2015) (". . . nor is it enough to say that a speech restriction would be easier to enforce") (citing *McCullen*).

*McCullen* did not break new ground on this point. The Supreme Court has repeatedly held that when it comes to protected speech activity, prophylactic restrictions pose serious constitutional concerns. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone. . . ."); *accord Riley v. National Fed'n of Blind*, 487 U.S. 781, 801 (1988) (same); *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637 (1980) (same). The requirement of narrow tailoring "prevents the government from

8

too readily 'sacrific[ing] speech for efficiency'"—precisely what the City has done here with the speech-restricting, prophylactic Ordinance in this case. *McCullen*, 573 U.S. at 486 (citation omitted).

**E.    The Ordinance is Doomed by its Overinclusiveness.**

The City states that EWM is the only healthcare facility "that has requested demarcation lines to create a buffer zone." Doc. 13, PageID.121. This fact, standing alone, is ample evidence of how the City's remedy far exceeds the alleged interests behind the Ordinance. Instead of legislatively dealing with the issues outside the one facility where bad conduct is taking place, the City has created (or authorized) buffer zones outside the entrance of *every* healthcare facility in the City. *See* Ordinance, Sec. A, and its broad definition of "Healthcare Facility." The law struck down in *McCullen* applied only, and more narrowly, to "*reproductive* health care facilit[ies]," 573 U.S. at 471 (emphasis added), and yet the Court held that because problems were only to be had at one such facility, to create zones outside *all* clinics in the state "is hardly a narrowly tailored solution." *Id.* at 493.[9]

The City's response, that the Ordinance is a "local" ordinance, does not automatically create zones outside all healthcare facilities, and involves a smaller buffer zone, woefully misses the point. Doc. 13, PageID.121. The City fails to prove that the *overinclusive* nature of the Ordinance, creating (or authorizing) buffer zones outside *all* healthcare facilities, to deal with problems *only* at EMW, satisfies the "demand [of] a close fit between ends and means" that narrow tailoring requires. *McCullen*, 573 U.S. at 486. The City says nothing about the decisions cited by Plaintiffs in support of their overinclusiveness argument (all of which dealt with "local" laws), Doc. 5-1, PageID.54–55, and that silence speaks volumes. *See, e.g.*, *Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015) (holding that a

---

[9] While *Hill* states that it is of "no constitutional significance" that "coverage of a statute is broader than the specific concern that led to its enactment," Doc. 13, PageID.121 (quoting *Hill*), that language comes from the Court's consideration of the petitioners' overbreadth challenge. *See Hill*, 530 U.S. at 730–32 (Sec. V). But here, as in *McCullen*, the overinclusiveness of the law is a failure of *narrow tailoring*, separate from overbreadth considerations. *See McCullen*, 573 U.S. at 512 n.9 (noting that because the law was not narrowly tailored, it did not need to consider petitioners' overbreadth challenge).

county-wide regulation of speech, in the absence of a county-wide problem, "burdened more speech necessary") (citing *McCullen*, 134 S. Ct. at 2539). The Ordinance sweeps far greater than the interests it supposedly serves.

F. ***Hill v. Colorado* has no Relevance to this Case**

It cannot be seriously questioned that the Ordinance is modeled on the law struck down in *McCullen*; not the law upheld in *Hill*. The only noteworthy differences between the law in *McCullen* and the Ordinance (which are *verbatim* the same in certain sections) are (1) to what facilities the zones apply, (2) the size of the zones, and (3) when and how the zones are created. But none of these differences render the Ordinance more narrowly tailored than the state's in *McCullen*. The Massachusetts law, unlike the Ordinance, applied only to reproductive health care facilities, 573 U.S. at 464, and contained, moreover, the operative language that the Ordinance is lacking, i.e., that zones are only enforceable "when clearly marked and posted." *Id.* at 472. Finally, as in *McCullen*, the size of the buffer zone is irrelevant when the City has failed to demonstrate that *any* speech-suppressing zone would be a narrowly tailored remedy. Among *McCullen*'s suggested "variety of approaches" that Massachusetts could have adopted to further its interests one approach is notably absent: a smaller zone. 573 U.S. at 494. The reason for this is obvious: such fixed zones "exclude individuals from areas historically open for speech and debate," *id.*, and raise the concern that a government "has too readily forgone options that could serve its interests . . . without substantially burdening" protected speech. *Id.* at 490.

The City evades the critical difference between the eight foot *floating bubble* zone in *Hill* and the ten foot *fixed buffer* zone in the Ordinance. It not only closes a blind eye to the fact that the Ordinance imposes a serious burden on Plaintiffs' counseling, *see supra* at Sec. B, the City admits that the Ordinance places a burden *on the patient* who may want to hear what Plaintiffs wish to say: "[i]f a patient wants to engage," she can "step out of the buffer zone." Doc. 13, PageID.122. The law in *Hill* placed no such burden on patients—the very persons, after all, the law was allegedly designed to

10

protect. *Hill* thus allowed for the very counseling Plaintiffs wish to engage in, when the patient consents. Not so here, where the Ordinance not only burdens sidewalk counselors, but patients as well.

Lastly, while the City acknowledges that *Hill* allowed for counselors to stand at the very entrance of a facility to try to and hand a patient a piece of literature, the City ignores why that makes a critical difference. Doc. 13, PageID.119. The Ordinance's fixed buffer zone removes Plaintiffs' ability to do just that: to share a final word with a patient before she walks into EMW and makes an irrevocable choice, potentially not knowing other options and resources available to her.

Only the Supreme Court can overturn *Hill v. Colorado*, and Plaintiffs are not asking the Court to do so. But, in light of *McCullen*'s obvious application to this case—and *Hill*'s irrelevance—this Court should place as much weight on *Hill* as the Court did in *McCullen*: none.

**G.     Other Jurisdictions and Court Decisions do not Support the Ordinance.**

The City wants to claim that the size of the buffer zone the Ordinance creates is one of the smallest in the country and cites cases to that effect. Doc. 13, PageID.120. That is a red herring. In *Price v. Chicago*, 915 F.3d 1107 (7th Cir. 2019), the Seventh Circuit upheld Chicago's eight-foot bubble zone because, as the court noted, the ordinance was "materially identical" to the Colorado statute at issue in *Hill. Id.* at 1119. As Plaintiffs have already explained, however, the Ordinance is different in kind and operation than the floating bubble zones at issue in *Hill* and thus, *a fortiori*, the ordinance in *Price*. See Doc. 5-1, PageID.60–61.

In *Bruni v. City of Pittsburgh*, 941 F.3d 73 (3d Cir. 2019), the Third Circuit upheld a buffer zone that barred congregating, patrolling, picketing, and demonstrating within 15 feet of a hospital or healthcare facility. In upholding that zone, however, the court specifically held that *it did not apply to sidewalk counseling. Id.* at 88. It is undisputed that the Ordinance bans *all free speech activities* within its buffer zones, including sidewalk counseling.

11

Finally, in *Turco v. Englewood*, 935 F.3d 155 (3d Cir. 2019), the Third Circuit did *not* uphold the ordinance challenged in that case, as the City confusingly claims. Doc. 13, PageID.120. Rather, it simply held that neither side was entitled to summary judgment because issues of material fact remained to be decided. *Id.* at 158. Moreover, and importantly, the city's buffer zones in that case do not work in the same way the City claims they work here: granting all healthcare facilities the unbridled power and discretion to create no-speech zones outside their entrances. *See* Ordinance, Sec. C (the Department of Public Works ("DPW") "shall" paint buffer zone lines at the request of a healthcare facility).

Indeed, after *McCullen*, several jurisdictions took steps to revise or renounce their buffer zone ordinances.[10] Massachusetts itself did not create a smaller buffer zone in light of *McCullen*, but amended its law, modeled on FACE, to prohibit, *inter alia*, a person "who, by force, physical act or threat of force, intentionally injures or intimidates or attempts to injure or intimidate a person who attempts to access or depart from a reproductive health care facility." Mass. Gen. Laws, ch. 266, § 120E½(d). Massachusetts understood the gravamen of the case it lost unanimously: the constitutionally appropriate remedy to deal with bad actors is to pursue bad actors, not to create a prophylactic measure that sweeps innocent persons—and their constitutionally protected activity—into its reach. The City should have followed Massachusetts's lead in how it remedied its unconstitutional law, not adopt an equally unconstitutional one.

---

[10] For example, the City of Portland, Maine, which adopted a buffer zone ordinance modeled on the Massachusetts law struck down in *McCullen*, repealed the ordinance soon after the decision was handed down. *See Fitzgerald v. Portland*, 2:14-cv-00053-NT, 2014 U.S. Dist. LEXIS 152492, *5 (D. Me. Oct. 27, 2014) (noting that, after the Supreme Court's decision in *McCullen*, the City Council of Portland voted to repeal its ordinance, "effective immediately"). It is also worth noting that the laws challenged in *Bruni* and *Turco* were adopted *prior* to *McCullen*. According to Plaintiffs' knowledge, the City is the only government in the country to adopt a *McCullen*-like law in the wake of that decision.

**H.     When and How Buffer Zones are Created is Vague, and the Ordinance, as Interpreted by the City, Violates Due Process.**

The City claims that the words of the Ordinance are clear: buffer zones are only created when the DPW paints the lines when requested. Doc. 13, PageID.124. But this Court would not have needed to provide a limiting construction of the Ordinance in *Sisters for Life* if the language was as clear as the City claims. *See Sisters for Life, Inc. v. Louisville-Jefferson Cty. Metro Gov't*, No. 3:21-cv-367-RGJ, 2021 U.S. Dist. LEXIS 201608, at *24-25 (W.D. Ky. Sep. 3, 2021). There is no need to belabor what Plaintiffs have already argued on this point. *See* Doc. 5-1, PageID.58–59, 63–66. In not providing that zones are only enforceable when "clearly marked and posted," as did the laws in *McCullen* and *Turco*, the Ordinance is missing the very language critical to its operation. *Id.*

Nonetheless, assuming *arguendo* that the City's interpretation is accurate, the City whistles past Plaintiffs' due process argument that, according to the City's own reading of the Ordinance, every healthcare facility in the City is now empowered to have the DPW create a no-speech zone outside its entrance for any potentially discriminatory reason—or no reason at all. *See* Doc. 5-1, PageID.18, 63–65. In fact, the City does not dispute that facilities have been so empowered, but shrugs it off as involving hypotheticals. Doc. 13, PageID.124. But as Plaintiffs already pointed out—ignored by the City here—the problem is not *whether* such facilities will have zones created for content- or viewpoint-based reasons, but that there's nothing in the Ordinance that prevents them from doing so. Doc. 5-1, PageID.64 (citing *Forsyth County*, 505 U.S. at 133 n.10).

Thus, according to the City's own understanding of how it operates, the Ordinance not only violates due process, by granting private entities unbridled discretion to have buffer zones imposed, it further exposes the Ordinance's Achilles's heel: granting every healthcare facility within the City the legal authority to suppress speech in traditional public forums for content- or viewpoint-based reasons, because of conduct-based problems at only one location, is hardly a narrowly tailored solution. *McCullen*, 573 U.S. at 493.

**I.      Can Plaintiffs Cross Through the Zones to Get to the Other Side?**

The City blithely states that the Ordinance means what it says, and in response to the question posed by Plaintiffs, i.e., whether they can cross through the zone outside EMW to get to the other side, the City appears to answer "no." Doc. 13, PageID.125. The City says, "if the person is not walking to a different destination, they are prohibited, by the Ordinance, from entering the buffer zone." *Id.* It goes on to say, "walking around the buffer zone to get to the other side is no burden to Plaintiffs." *Id.*

There are two problems with these assertions. First, it renders the meaning of the word, "destination," vague. The destination of Plaintiffs, standing on one side of the zone and who wish to speak with a patient approaching EMW from the opposite side, is *not the facility*, it's the other side of the zone where the patient is approaching the clinic. The City fails to explain why, in this example, Plaintiffs, and other similarly situated persons, do not fall within the Ordinance's exemption of "using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility." Ordinance, Sec. B(2)(b).

Second, it is simply false to state that walking around the zone imposes no burden on Plaintiffs. Kentucky state law provides that "[w]here a sidewalk is provided and its use is practicable, it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway." KRS § 189.570(12). Because Plaintiffs cannot walk around the zone by walking into the street to get to the other side, they would have to walk around the entirety of the city block to speak with a person who might only be fifteen feet away. Any attempt to do that would obviously be fruitless. The City's interpretation of the Ordinance not only underscores the vagueness of the law, it further demonstrates the significant burden it imposes on Plaintiffs' protected speech activities.

If the Ordinance were as clear on this point as the City believes, why have Plaintiffs been told by an officer charged with enforcing the Ordinance that they are free to cross through the zone to get

14

to the other side? Doc. 1, PageID.9 at ¶ 46. The officer may have understood what the City here does not: barring sidewalk counselors to walk through the buffer zone at EMW to get to the other side not only ignores one of the Ordinance's stated exemptions, it creates an even greater obstacle for them to engage in free speech on a public sidewalk.

The conflicting interpretations of the Ordinance among agents of the City are further evidence that it is vague on its face and in its application to the facts of this case. The Fourteenth Amendment's Due Process Clause does not countenance it.

**J.      Remaining Preliminary Injunction Factors**

Plaintiffs need not reply to the City's discussion of the remaining preliminary injunction factors. Because they have a likelihood of success on the merits of their claims, the other preliminary injunction factors are satisfied. *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) ("if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment"); *see also id.* (quoting *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)) ("'it is always in the public interest to prevent violation of a party's constitutional rights.'").

## CONCLUSION

Plaintiffs respectfully request that the Court enter a preliminary injunction against the enforcement of the Ordinance.

Respectfully submitted on this 22d day of December 2021,

s/ Francis J. Manion
Francis J. Manion
Geoffrey R. Surtees
American Center for Law & Justice
Post Office Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax 502-549-5252
fmanion@aclj.org; gsurtees@aclj.org

15

**CERTIFICATE OF SERVICE**

I certify that I have served the foregoing via the Court's CM/ECF system, which will provide notice to all counsel or parties of record, on this 22d day of December 2021.

s/ Francis J. Manion<br>
Francis J. Manion